# EXHIBIT A

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ___ FEPA<br>___ EEOC | |

| Ohio Civil Rights Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr. Ms. Mrs.)* | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mrs. Julie Kelly** | **(513) 806-4893** | **11/07/1977** |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **823 Dorgene Lane, Cincinnati, OH 45244** | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **First Data Corporation** | **20,000 +** | **(866) 382-8643** |
| Street Address | City, State and ZIP Code | |
| **5565 Glenridge Connector #2000, Atlanta, GA 30342** | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **First Data Corporation** | **20,000+** | |
| Street Address | City, State and ZIP Code | |
| **11311 Cornell Park Drive, Cincinnati, OH 45242** | | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest    Latest |
| __ RACE __ COLOR _X_ SEX __ RELIGION __ NATIONAL ORIGIN | **11/302017** |
| _X_ RETALIATION __ AGE _X_ DISABILITY __ OTHER (Specify below.) | ___ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attached extra sheet(s)):*

**See accompanying letter from The Law Office of Shawn Shearer, P.C., counsel for the complainant, and the attached supporting affidavit of Julie Kelly.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | MICHAEL REITENBACH<br>Notary Public, State of Ohio<br>My Commission Expires<br>September 23, 2018 |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT |
| 5/16/18<br>Date     Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)*   05 - 16 - 18 |

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254
DALLAS, TEXAS 75204
OFFICE: (972) 803-4499
SHAWN@SHEARERLAW.PRO

---

May 16, 2018

**<u>VIA USPS RETURN RECEIPT REQUESTED</u>**

Equal Employment Opportunity Commission
Director
Cincinnati District Office
John W. Peck Federal Office Building
550 Main Street, 10th Floor
Cincinnati, OH 45202

   RE: Title VII, ADA and Ohio Fair Employment Charges by Julie Kelly against First
      Data Corporation
      NEW CHARGE FILING

Dear Sir or Madam:

I represent Julie Kelly ("Ms. Kelly") in connection with the termination of her employment with
First Data Corporation and its subsidiaries and affiliates ("First Data"), and in the filing and
prosecution of charges by Ms. Kelly under the American's with Disabilities Act (42 U.S.C.
§12101 et seq.) ("ADA"), sex discrimination under Title VIMs. Kelly's (42 USC §2000e et
seq.), and the corresponding charges under and violations of, the Ohio Fair Employment
Practices Act (OH Rev. Code §4112.01 et seq.), including retaliation and harassment/hostile
environment.

Please accept this letter, the attached Charge Forms, and Ms. Kelly's attached supporting
affidavit (with exhibits), together, as an official charge of discrimination against First Data under
the ADA, Title VII, and Ohio's Fair Employment laws in connection with its adverse
employment action taken against Ms. Kelly.

Also, please accept this letter as an appearance by Shawn Shearer of The Law Office of Shawn
Shearer, P.C. on behalf of Ms. Kelly. Ms. Kelly's contact information is included both on the
Charge Form and Ms. Kelly's supporting affidavit attached to this letter. Ms. Kelly's would ask,
however, that all correspondence be directed to Shawn Shearer as Ms. Kelly's counsel, using the
contact information above.

Set forth below are the general facts surrounding Ms. Kelly's employment with First Data and
her constructive termination by First Data. Following the factual description is the legal analysis

EEOC – Cincinnati Division
May 16, 2018                                                                                                  Page 2

justifying a finding that First Data violated Title VII, the ADA, and the corresponding laws of
the State of Ohio in its treatment and termination of Ms. Kelly.

## FACTUAL BACKGROUND – KELLY/FIRST DATA

Ms. Kelly started her employment with First Data Corporation in 1998. From 1998 through
November 2017, Ms. Kelly was employed by First Data, and various of its subsidiaries and
affiliates (together "First Data"). Ms. Kelly's employment with First Data terminated on
November 30, 2017. Over nearly 20 years with First Data, Ms. Kelly held several positions,
primarily in the fields of training and development of First Data's employees. The last four
positions Ms. Kelly held were the following:

| | |
|---|---|
| 2005-2011 | Instructional Design & Development Manager – Sales Training |
| 2011-2013 | Learning Solutions Manager – Global Talent Management |
| 2013-2017 | Instructional Design & Development Leader – Sales Transformation |
| Feb. 2017 | Director, Organizational Development – Talent Management |

During the times relevant to this EEOC Charge, Ms. Kelly's direct supervisors were Bryan
Fricke VP Sales Training/Transformation (Sept 2013 to April 2014), Steven Barger SVP Sales
Transformation (April 2014 to November 2016), and Robin Ording VP Human Resources and
Training (November 2016 to November 2017).

In April of 2005, Ms. Kelly was promoted into the position of Instructional Design &
Development Manager and began working remotely and exclusively from Ms. Kelly's home
office. Ms. Kelly managed a team of 10 Instructional Developers, web and video producers who
created learning program and materials for 2,000 internal employees and 5,000 external sales
representatives.

On December 12, 2012, Ms. Kelly gave birth to twins. The pregnancy, delivery, and medical
issues following were serious and difficult. Ms. Kelly returned to work after her FMLA
pregnancy leave in March of 2013 at which time she returned from leave with no changes to her
position or responsibilities. Upon return from her leave, Ms. Kelly continued to work remotely
from her home office. The medical complications from delivery, including post-partum
depression, and the physical ailments described more thoroughly below, have been treated by
physicians ever since that pregnancy and delivery.

On April 29, 2013, First Data hired a new Chief Executive Officer, Frank Bisignano. This hiring
unsettled First Data's Global Talent Management team in which Ms. Kelly worked because of
Mr. Bisignano's history of management in prior positions and his management style of a merry-
go-round of terminations and hiring new "blood" as a management style of intimidating
employees. Immediately following the hiring of the new CEO, high-ranking leaders of First Data
(Peter Boucher, SVP Human Resources, David Kuhl, SVP Global Talent Management) were
terminated. The Global Management Team was leaderless after these terminations and was in

'limbo', trying to find a place in the organization. During this period of transition, Ms. Kelly reported directly to Karen Whalen, SVP Human Resources.

In late 2013 Bryan Fricke VP Sales Training, was assigned to lead the Sales Training / Sales Transformation Team, and he reported to Joe Plumeri, Co-Chairman of First Data. First Data conducts their payroll through various company codes. This meant that because of all the reporting changes in 2013, employees in Ms. Kelly's group received numerous W2s to report earnings for 2013. Under the management of Mr. Fricke, Ms. Kelly's group's positions continued as work from home employees. Travel was required due to Ms. Kelly's leadership position and Ms. Kelly met those obligations, even traveling on First Data business and taking her twins and nanny on trips, and using meeting breaks while on travel to feed her infants. During this period, Ms. Kelly's job responsibilities remained the same with respected reporting to senior leadership.

In mid-2014, Ms. Kelly's supervisor, Bryan Fricke, suddenly resigned from the company with no notice. Steve Barger, who they were then working with as a consultant, was brought on as an employee and became the SVP of Sales Transformation.

In October of 2014, Ms. Kelly was pregnant, and her OB-GYN ordered no travel or Ms. Kelly would be subjected to full bedrest due her high-risk pregnancy, preexisting medical conditions that were continuing from her pregnancy and birth of her twins two years prior, her prior c-section, her myomectomy and her age. Ms. Kelly completed and submitted Workplace Accommodation Request, with the guidance of Ms. Kelly's then manager Mr. Barger and HR Manager, James Britt. This request for accommodation by working from home was approved, and Ms. Kelly was able to work up until her scheduled c-section date with no loss to productivity.

In January 2015 (approx.), First Data's Chief Executive Officer changed First Data's work from home policy. This policy change required all employees to work in an office. This was not a popular decision with employees and during every "town hall meeting" held by the new CEO to discuss issues with First Data employees, the topic would arise for discussion and the CEO would always state in response to employee questions about the work from home policy that he could not work productively from home, and therefore he felt no one else could do so (these meetings are recorded).

On February 20, 2015, Ms. Kelly gave birth to her son. Ms. Kelly's son was born through a scheduled c-section at approximately 38 weeks of gestation. The delivery was complicated, and Ms. Kelly's son was held in the Neonatal Intensive Care Unit for 3 days due to breathing issues with underdeveloped lungs. Ms. Kelly's son was also born with a Vascular Malformation, which required immediate attention and numerous appointments over the next year to the Cincinnati Children's Hospital Hemangioma and Vascular Malformation Center in downtown Cincinnati, Ohio

Following the birth of Ms. Kelly's son, Ms. Kelly was brought back into the hospital for a c-section infection that nearly killed her. Ms. Kelly suffered severe post-partum depression. This depression caused Ms. Kelly to be unable to breast feed her son after only 4 weeks. Ms. Kelly's medical conditions included blood infection, post-partum depression, severe recti diastasis, and umbilical hernia.

On April 23, 2015, despite these medical complications, Ms. Kelly returned to work 8 weeks after the birth of her son under First Data's standard 8-week leave following a c-section. Upon return from that leave, Ms. Kelly's job remained essentially the same; however, Ms. Kelly was now impacted with the new policy prohibiting work from home.

Between March 2015 – August 2015, the new work from home policy was enforced on the employees in the Sales Transformation team. The policy was targeted to work from home employees (from First Data's PeopleSoft data) other than those employees that were involved in direct sales in the field. At the direction of James Britt, Human Resources Manager, work from home employees were contacted and provided with distinct options such as relocating to Atlanta, GA (if no First Data office was in their area) or accepting a severance package once an end date was decided upon. All vacated positions had to be rehired in Atlanta, GA. The change in the work from home policy required Ms. Kelly to begin going to the First Data office in Cincinnati daily, an 1 – 1.5 hour commute each way. There were only approximately 35 employees of First Data assigned to the Cincinnati office, none of whom were at all related to Ms. Kelly's position and team. In other words, no one in the Cincinnati office directly interacted with Ms. Kelly in connection with her responsibilities within the training and education group.

In April of 2015, Ms. Kelly wrote a resignation letter to her supervisor, Mr. Barger (SVP Sales Transformation), which was standard operating procedure as Ms. Kelly was advised by James Britt (Manager HR). Ms. Kelly advised Mr. Barger that she would not be able to make the commute due to health and family and would accept the offered severance package. Mr. Barger and Ms. Kelly engaged in an interactive process and discussed Ms. Kelly's specific situation, which included Ms. Kelly's need for an accommodation for Ms. Kelly's post-partum depression and other medical conditions following the birth of Ms. Kelly's twins in December 2012 and most recently Ms. Kelly's son in February 2015. Ms. Kelly's request to continue working from home as an accommodation was approved because her role did not have any connection whatsoever to the Cincinnati office personnel, as he job functions were in support of First Data's world-wide operation. With the technology available to Ms. Kelly, she could perform her job function from nearly any location with an internet connection without any reduction in productivity.

Ms. Kelly continued to work from home under Mr. Barger, with absolutely no negative impact to Ms. Kelly's performance and no negative performance reviews.

About a year later, between April of 2016 and July of 2016, Ms. Kelly was hospitalized for health issues. This lead to numerous tests and biopsies to diagnose Non-Alcoholic Fatty Liver Disease (NAFLD), high blood pressure and stress disorder. All of which could be continuing

THE LAW OFFICE OF SHAWN SHEARER, P.C.

EEOC – Cincinnati Division
May 16, 2018                                                                                          Page 5

conditions arising from her difficult pregnancies.

In September of 2016, Ms. Kelly had her first interaction with Ms. Robin Ording. Ms. Kelly had been assigned to a project by Mr. Barger to attend a face-to-face conference to provide the Sales Transformation and Training Group's proposal to translate the learning programs from in-person interactive courses into virtual courses to eliminate the extravagant costs the interactive programs. While Ms. Ording was aware of why Ms. Kelly was attending the conference to discuss proposals, Ms. Ording never acknowledged the importance of Ms. Kelly's tasks and Ms. Ording conducted herself in an unprofessional way, showing coworkers photos on her phone and speaking in a crude manner. The Sales Transformation and Training Group proposal was submitted, with descriptions and evidence of the ways to fully measure the effectiveness of the virtual courses and retention of the content by those taking virtual courses in comparison to the then current interactive courses, to Ms. Ording and her direct report Christopher Calta (Director of Training). Th group's proposal only received a brief response that Ms. Ording and Mr. Calta liked the format of the proposal, but no comment on its content. Ms. Ording continued the existing program, with no measurement, accountability, or return on investment analysis.

In November 2016, Mr. Barger took FMLA leave while he recovered from cancer surgery. Ms. Ording became interim leader of the Training Group and became Ms. Kelly's direct supervisor. Mr. Barger's employment was terminated in February 2017 before he could return from leave and Ms. Ording became Ms. Kelly's permanent and last direct supervisor.

Based on Ms. Kelly's experience, and the reputation of Ms. Ording at First Data was one of having extremely high attrition with her direct reports, creating an uncooperative, hostile work environment and being ignorant of sales and adult learning & development methodology, Ms. Kelly knew Ms. Ording looked down on her and the other subordinates of Ms. Ording. This belief was proven. Ms. Ording was always condescending to Ms. Kelly, and unprofessional and often extremely disrespectful and mean to Ms. Kelly.

Ms. Ording began taking over for Mr. Barger by enforcing the prohibition on working from home. She monitored Ms. Kelly's attendance by "swipe-ins" (monitoring use of Ms. Kelly's security badge to enter First Data's offices). This swipe-in information was reported out by Karen Beck, SVP Human Resources, for Tony Marino's (Executive Vice President of Human Resources) organization monthly. If an employee's percentage of swipe-ins over the month was below a threshold, disciplinary action would take place. Ms. Kelly, despite the accomodations granted by her previous two supervisors, was now forced under threat of adverse employment action, to "swipe-in" on a daily basis and no longer could work from home.

During January 2017, Ms. Kelly rearranged her entire life and schedule to accommodate the new policy (exactly the opposite of what is required under the ADA and Ohio Fair Employment Law) under which Ms. Ording should have been accommodating Ms. Kelly as her previous two supervisors had done). Ms. Kelly's adjustments included hiring extra daycare for her three children under the age of 4. Arranging transportation for her 17-year-old step-daughter over which her and her husband had full custody from his prior marriage (she needed to be driven

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

to/from school 30 minutes away from the family home), care providers for Ms. Kelly's live in mother-in-law (85), and assistance for Ms. Kelly's brother (36) with learning disabilities. Due to Ms. Kelly's husband's career, he was unable to assist as he travels extensively throughout the work week. Note that while Ms. Kelly's was working from home under the supervision of Mr. Fricke and Mr. Barger, these domestic and family care concerns were handled without interruption of her job performance and productivity. The unjustified policy of requiring swipe-ins without any reference to the job functions of the employee, especially when Ms. Kelly did not work directly with the employees in Cincinnati, required Ms. Kelly to think hard, often, and more strategically as to how to handle her family responsibilities and her responsibilities to her employer and her job, and the impact of these stresses on her medical conditions. In addition, her required adjustments cost her significantly more amounts to cover for her daily extensive unproductive time sitting in traffic and commuting to / from an office space where she did not need to be to satisfy her job duties.

In January 2017, Ms. Ording made Ms. Kelly draft her own job description. Based on Ms. Kelly's description, Ms. Ording indicated that she would need to relocate to Atlanta or another major office should Ms. Kelly continue with the company – effectively a constructive discharge. Ms. Kelly felt threatened and intimidated by Ms. Ording's demeanor, response, and lack of engagement in an interactive process.

In late January of 2017, the Sales Transformation and Training team went through a large reorganization that included the termination of 30% of the team which was alleged to create a cost savings of $3.3 million. Ms. Kelly was not included in that group of terminations. Ms.Ording continuously bragged to Ms. Kelly and the others on the team about this "significant" alleged cost savings on the backs of many terminated families, and Ms. Ording made offensive slurs about past leadership and terminated employees. At the time, Ms. Kelly was assigned to be the interim manager of a group in Hagerstown, MD. The employees that were on this team communicated to Ms. Kelly that she was the first person who gave them any attention since Mr.Barger.

On January 24, 2017, Mr. Anthony Marino (EVP of HR) granted Ms. Kelly 962 shares of restricted stock for leadership and execution during the transition. The restriction on these shares were to be lifted in three tranches, with the first vesting to occur on January 24, 2018. In other words, based on the value of the shares at that time, Ms. Kelly would receive an additional $1,500 to $2,000 each of one, two, and three years later.

In Ms. Kelly's position, Ms. Kelly managed a staff of Instructional Development Manager, Instructional Developers, Project Manager and Training Coordinator. Ms. Kelly also developed training programs, curriculum, and training materials. Ms. Ording began assigning more and more projects to her outside of her regular job responsibilities, including asking Ms. Kelly to perform Ms. Ording's responsibilities as a Vice President and leader of the Training Group. For example, Ms. Kelly was asked to, and did, put together data, analysis, templates and communications for the entire team, that Ms. Ording would take and present to senior leadership as her own. These administrative tasks of an officer like Ms. Ording were not within the job of a Director with responsibilities to develop and implement training programs for the company. Ms.

Ording could not fulfill her duties and asked Ms. Kelly to continue to perform her assigned job functions and to take addition work that belonged to Ms. Ording that should could not, or was unable to, complete. Ms. Ording often asked Ms. Kelly to do last minute tasks, after hours, because a Management Committee member needed something done. She knew Ms. Kelly's health and family situation but paid no regard and continued to press and demand that these extra tasks be performed by Ms. Kelly.

In February 2017 Ms. Kelly was promoted from Manager to Director and received a raise of $8,000 per year. Ms. Kelly's final annual salary at First Data was $107,500. Ms. Kelly's new position included all Ms. Kelly's responsibilities of her previous Manager position plus the addition of duties normally assigned by First Data to Vice Presidents, and areas outside of Ms. Kelly's training and education responsibilities, including the following:

    a.  VP & SVP Promotion Process
    b.  Company-wide Performance Evaluation Process
    c.  Executive Succession Planning
    d.  Audits of Performance Management data for companies such as Ernst & Young and PWC
    e.  360 Assessment Tool Process with external vendors.

At times, the drive to and from the office would take Ms. Kelly 1.5 - 2 hours each way. Ms. Kelly's team was aware of the strain this was putting on her, her health, and her family, and Ms. Kelly was often asked how she was able to remain at such a high level of productivity with all of the demands placed upon her.

Ms. Kelly advised Ms. Ording of the difficulty the situation was causing. Ms. Kelly felt was trying to drive her out of the company, force her to quit so that the company did not need to incur further severance expense. Ms. Ording flatly refused to allow Ms. Kelly to work from home or even to allow some days at home and some days in the office, despite Ms. Kelly's prior supervisors granting such accommodations. The requirements of Ms. Kelly's position could easily be satisfied working from home. Ms. Ording's management style was quite harsh, threatening and intimidating. Ms. Kelly felt that to keep her job, she needed to comply with Ms. Ordings demands despite the impact they were having on her health and well-being. With Ms. Ording serving in the role of Vice President of Human Resources, a high level within the First Data HR department, Ms. Kelly felt there was no one to whom she could speak that had authority to engage in an interactive process without suffering Ms. Ording's wrath.

On July 27, 2017, Ms. Kelly as directed by Anthony Mario (EVP of HR) and Ms. Ording (VP of HR) to use material Ms. Ording had taken from her prior employers and other companies (CitiBank and Chase Paymentech) to use for First Data's internal processes. Ms. Kelly felt this was a breach of ethics but was ordered to do it anyway. Ms. Kelly came to the realization that the First Data promotion process and criteria were plagiarized from those establishments. Ms. Kelly was not in a position to object for fear of retaliation from Ms. Ording and Mr. Marino.

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

On July 28, 2017, Ms. Kelly was directed by Ms. Ording to hide certain files so that the internal audit team did not see them and want to review them. Ms. Kelly was then told to move the files back after the audit took place. Ms. Kelly was not able to object for fear of her job; especially given the resistance she had received in her prior interactions with Ms. Ording on her accommodation requests.

On October 5, 2017, Ms. Kelly needed to leave the office and go to the emergency room for chest pains arising out of her medical conditions that continued from her pregnancies, as exacerbated by the stress of her commute and excessive, newly assigned duties placed upon her, unrealistically, in addition to her former training and education duties. Ms. Ording's failure to accommodate, and then imposition of additional responsibilities, and threats of termination if functions were not performed, had finally taken a real physical toll on Ms. Kelly.

Ms. Kelly had been under the care of medical doctors and psychiatrists the entire time between the birth of her twins until the end of Ms. Kelly's employment at First Data (2012 through November 2017). During this time, Ms. Kelly was prescribed numerous pharmaceuticals to address her medical conditions, anxiety, focus and stress.

The situation at First Data with daily commutes, combined with the additional duties Ms. Ording imposed, Ms. Ording's hostile work ethic, intimidation and abusive behavior toward Ms. Kelly, and Ms. Kelly's medical conditions, Ms. Kelly determined that approaching Ms. Ording again for an accommodation would be met with hostility (possibly loss of her job), and that the impact of employment at First Data without requested accommodations was too greatly impacting her health. Ms. Kelly concluded that based upon Ms. Ording's treatment of her, and lack of caring for her physical health, she had no choice but to resign. Ms. Ording would not accommodate Ms. Kelly's medical conditions. Ms. Kelly was constructively discharged.

Ms. Kelly advised Ms. Ording of her resignation and requested severance similar to the packages First Data had been providing to employees previously terminated, and similar to the package she thought of accepting earlier, but did not because her prior supervisor, Mr. Barger agreed that her work from home accommodation was reasonable and not a hardship on the company. When Ms. Ording heard this request, Ms. Ording laughed in Ms. Kelly's face and stated 'you quit, you get nothing' and used her superior position to even further ridicule and intimidate.

Ms. Kelly's last day of employment with First Data was November 30, 2017. All of Ms. Kelly's equity awards were forfeited. Ms. Kelly did not receive an exit interview. Ms. Kelly did not sign any papers upon her departure. Ms. Kelly even had to order her own shipping materials, at her expense, to return the laptop and other devises in her possession that issued by First Data.

Upon Ms. Kelly's departure, Ms. Ording (based in Melville, NY and also with an office in Altanta, GA) transferred Ms. Kelly's job responsibilities to two individuals in her department located in the United Kingdom.

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

EEOC – Cincinnati Division
May 16, 2018                                                                                                                    Page 9

On December 5, 2017, Ms. Kelly's received a threat letter from Lori Graesser, in-house counsel for First Data in its Omaha office, stating that Ms. Kelly had alleged post-employment obligations, including an alleged 24 month non-compete, non-solicit, and other restrictions prohibiting her from seeking employment in the only industry in which she had worked for 20-years. Ms. Kelly has not sought employment, despite opportunities in the Cincinnati area, with any company that could be considered a competitor due to Ms. Graesser's illegal and retaliatory threats. Ms. Kelly responded asking for a copy of what Ms. Kelly signed containing these restrictions, because Ms. Kelly did not sign anything. Ms. Kelly never received a response.

In August 2017, Mr. Barger (Ms. Kelly's supervisor prior to Ms. Ording) filed suit against First Data alleging that First Data violated the FMLA in connection with his termination while on FMLA leave recovering from cancer surgery, and in that case, Mr. Barger subsequently added a claim for First Data's violations of the ADA related to his treatment while undergoing cancer treatment, surgery and recovery.

During the last week of April and the first week of May 2018, I wrote to First Data's in-house legal department asserting that First Data had violated Title VII and the ADA by terminating Ms. Kelly's employment and by failing to continue the work-from-home accommodation that had been granted by Mr. Fricke and Mr. Barger while they were Ms. Kelly's supervisors. In response to my first request, First Data's response was that Ms. Kelly should send documents to the severance and equity plan administrators – conveniently, those plan administrators are First Data and are supported by the same in-house lawyers that had received my original letter. In response, I wrote and indicated that this EEOC Charge would be forthcoming. No response from First Data has been received over the past two weeks.

Just days after Ms. Kelly's ADA issues were brought to the attention of First Data's in-house legal counsel, undersigned counsel received notice that First Data would be taking Ms. Kelly's deposition in the *Barger v. First Data* case pending in the Eastern District of New York (1:17-cv-4869). A very odd reaction, and clear retaliation against Ms. Kelly for raising issues subject of the EEOC's jurisdiction. NO depositions have occurred in the *Barger v. First Data* case – the Plaintiff in that case has not even been noticed for a deposition and none of the defendants in that case have been deposed. Ms. Kelly is a fringe witness at best in Mr. Barger's claims against First Data (he was her supervisor) and certainly she is not a possible target to be the very first deponent by any litigator's standards. Ms. Kelly is not a party in the *Barger v First Data* case. The notice of Ms. Kelly's deposition was designed to harass her for raising her claims and an attempt to intimidate her from bringing this Charge to the EEOC. In direct response to this retaliation, Ms. Kelly has been forced to seek legal counsel.

EEOC – Cincinnati Division
May 16, 2018

## AMERICAN'S WITH DISABILITIES ACT CHARGE AGAINST FIRST DATA

The Americans with Disabilities Act 42 U.S.C. §12112(a) provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms and conditions of employment.

The Americans with Disabilities Act 42 U.S.C. §12112(b) provides:

> As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes - . . .
> (3) utilizing standards, criteria, or methods of administration –
>
>> (A) that have the effect of discrimination on the basis of disability; or
>
>> (B) that perpetuate the discrimination of others who are subject to common administrative control;
>
> (4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of a known disability of an individual with whom the qualified individual is known to have a relationship or association;
>
> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate the such an accommodation would impose an undue hardship on the operation of the business of such covered entity. . . .

For ADA purposes, (i) First Data is a "covered entity" as it has more than 22,000 employees (see First Data Corporation Form 10-K filed with The U.S. Securities and Exchange Commission), 2017); (ii) Ms. Kelly was an "employee" of First Data, and First Data was the "employer of Ms. Kelly; and (iii) Ms. Kelly was and is a "qualified individual." The medical and mental condition of Ms. Kelly arising out of two difficult pregnancies, conditions that continued for years after those pregnancies, were "disabilities" for purposes of the ADA.

The treatment of Ms. Kelly, and her resulting constructive discharge, violated 42 U.S.C. §12112(b)(3),(4) & (5).

The physical and mental conditions resulting from Ms. Kelly's two pregnancies are "disabilities" within the meaning of the ADA. First Data's and Ms. Ording's administration of Ms. Kelly's employment by revoking the work from home policy and then revoking her previous supervisors' grant of an exception to the revocation as an accommodation for her personal medical and mental issues, and to the disabilities of the individuals she was known to be

associated with (her 85 year old mother-in-law, her learning disabled brother, and the medical conditions of her children, all living in her home) had the effect of discriminating against the disabled (Ms. Kelly) and against her as being associated with those disabled. Remote work as a reasonable accommodation in Ms. Kelly's situation. See *Equal Employment Opportunity Commission (EEOC) v. Ford Motor Company* (6th Cir. 2014). Ms. Kelly's position had been designated a work-from-home position for years, and Ms. Kelly's two supervisors prior to Ms. Ording accommodated her by allowing work-from-home. Ms. Kelly worked from home for many years and during that time she received promotions, salary increases, and had no negative performance reviews. Attendance at the office clearly was not an "essential function" of Ms. Kelly's position.

Ms. Ording and First Data further violated 42 U.S.C. §12112(b)(5) by revoking a previously granted reasonable accommodation under which Ms. Kelly had worked under the supervision of Mr. Fricke and Mr. Barger. This revocation was not due to an undue hardship on First Data. The revocation was based on CEO Bisignano's belief that because he cannot work productively at home, others cannot work productively in the home. This declared statement by the CEO demonstrates the clear lack of understanding of the needs of the disabled creating an atmosphere designed to exclude disabled employees and designed to force resignations and constructive discharges. Moreover, in the case of Ms. Kelly, Mr. Bisignano's statement regarding the prohibition on work from home, and Ms. Ording's enforcement of that policy, is based on provable false assumptions. Ms. Kelly worked effectively from home, satisfying all of her responsibilities and taking on increasing responsibilities for more than 5 years with no negative, and in fact very positive, performance reviews, and promotions and raises. There was no business justification, let alone an undue burden, for First Data and Ms. Ording to continue the accommodation that had been in place over such an extended period with no issues arising. Ms. Kelly's accommodation was revoked based on a clear institutional bias against the disabled and those associated with the disabled.[1]

In Ms. Kelly's case, telecommuting was a reasonable accommodation and physical presence in First Data's 35-person Cincinnati office where none of those employees were in the training group (when Ms. Kelly is working on training programs for employees and partners across the globe). Moreover, Ms. Kelly's supervisors during all relevant periods were located in New York or Atlanta, not in Cincinnati. And even further, Ms. Kelly's position was defined as a remote position for years until the change of policy. Ms. Kelly performed more than effectively remotely, and Mr. Barger approved her accommodation to work remotely while he was her supervisor and she received excellent reviews from him. It was not until Ms. Ording became her supervisor that the her job, previously administered to be a work-from-home, and then a work-from-home accommodation, was required to demonstrate attendance by "swipe-ins" or face adverse employment action.

---

[1] First Data's policy also is selectively enforced. See Exhibit A showing some of the work-at-home positions advertised since Ms. Kelly's termination.

Ms. Kelly tried for a year (November 2016 to November 2017) to comply with the new policy implemented by Ms. Ording revoking the previously granted accommodation. More and more projects outside of the scope of her position were placed on her, more and more demands were placed on her, her pay was not increased in any meaningful way, she suffered medical conditions from the stress and had resulting hospital visits.

Physical attendance at the small First Data Cincinnati office (in a company with 22,000 employees) was not an essential function of Ms. Kelly's position. Ms. Ording, Ms. Kelly's supervisor had an office in Melville, NY, and occasionally was in the Atlanta, GA office. Ms. Kelly would not be seeing Ms. Ording at all when she went to the small Cincinnati, OH office. Moreover, upon Ms. Kelly's termination, her job responsibilities were sent to employees in the United Kingdom. Attendance at the Cincinnati office of First Data is not an essential function of the position held by Ms. Kelly.

There was absolutely no justifiable reason for revoking the previously granted accommodation and such revocation, and Ms. Ording's failure to engage in any discussions regarding Ms. Kelly's requests to continue the accommodation, violate that ADA. The revocation of that accommodation resulted in the creation of an atmosphere of harassment and exacerbation of her medical conditions such that her only choice was her health (and the care of those disabled living in her home) or her job. This forced choice is the definition of a constructive discharge actionable as a violation of the ADA. [2] Moreover, the harassment of Ms. Kelly (including the actions of Ms. Ording and Ms. Graesser described above) based on her medical condition and those with whom she associated created a hostile environment to those with disabilities and is also actionable.

Given the hostile environment, Ms. Kelly does not believe reinstatement is a viable option, and therefore she seeks front-pay, in addition to her back-pay.

### TITLE VII CHARGE AGAINST FIRST DATA – DISCRIMINATION ON THE BASIS OF SEX/PREGNANCY DISCRIMINATION ACT

42 U.S.C. § 2000e-2(a)(1) makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

The Pregnancy Discrimination ACT (PDA) makes clear that discrimination based on pregnancy, childbirth, or related medical conditions is a form of sex discrimination prohibited by Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(k) provides:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions;

---

[2] A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987)

and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

Ms. Kelly's medical conditions arising out of her two pregnancies, some very personal in nature, were known to all her supervisors. Mr. Fricke and Mr. Barger took all the necessary actions to address those issues and concerns, provided Ms. Kelly all opportunities to advance, and Ms. Kelly performed admirably under all performance reviews.

Ms. Ording, on the other hand, did discriminate against Ms. Kelly, and harassed her based on the medical conditions arising out of her pregnancies. All the details of that harassment and treatment are set forth above. Ms. Ording and First Data violated the prohibition against discrimination based on sex because of the differing treatment Ms. Ording received following her request to continue her accommodation under the ADA because of medical conditions arising out of her pregnancy.

Moreover, the harassment of Ms. Kelly (including the actions of Ms. Ording and Ms. Graesser described above) based on her medical condition and those with whom she associated created a hostile environment actionable under Title VII.

Given the hostile environment, Ms. Kelly does not believe reinstatement is a viable option, and therefore she seeks front-pay, in addition to her back-pay.

## RETALIATION

Merely because the undersigned counsel raised the prospect of this charge being filed as a possibility in my communications with First Data's in-house counsel in an attempt to begin discussions, First Data immediately sought to serve a subpoena on Ms. Kelly to testify in the *Barger v. First Data* FMLA and ADA case pending before the Eastern District of New York. First Data has not noticed any other deposition in that case, and the case has been pending for nearly nine months. First Data has not even noticed plaintiff Barger for a deposition in that case. First Data's threatened Notice of Deposition of Ms. Kelly, given the temporal proximity of her raising the issues set forth in this letter, in litigation in which she is not even a part (but to which First Data is a defendant) gives rise to a presumption, if not in itself proof, of retaliation and harassment for asserting her rights under the ADA and Title VII. Because of that threat, Ms. Kelly has been required to seek legal counsel and has incurred monetary obligations for legal fees and advice. Moreover, such threats may further exacerbate her medical conditions that are subject of this letter.

EEOC – Cincinnati Division
May 16, 2018

Page 14

## OHIO FAIR EMPLOYMENT PRACTICES ACT

All the above describes conduct and claims are also actionable under the Ohio Fair Employment Practices Act OH Rev. Code §4112.01 et seq. based on discrimination against the disabled and based on sex.

I can be reached at (972) 803-4499 or on my cell (817) 915-8757 if you have any questions or require additional information.

Very truly yours,

Shawn E. Shearer

Attachments:

EEOC Charge Form 5
Affidavit of Julie Kelly
First Data Remote Job Openings

cc:     Julie Kelly

        Duffy Jamieson, Regional Director
        Ohio Civil Rights Commission
        Mid-Point Towers
        7162 Reading Road, Suite 1005
        Cincinnati, OH 45237

THE LAW OFFICE OF SHAWN SHEARER, P.C.

# EXHIBIT B

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|
| X FEPA | DAYB6(27240)05172016 |
| EEOC | AMENDED |

Ohio Civil Rights Commission
_State or local Agency, if any_ _____ and EEOC

| Name (indicate Mr. Ms. Mrs.) Mrs. Julie Kelly | Home Phone (Incl. Area Code) (513) 806-4893 | Date of Birth 11/07/1977 |
|---|---|---|

Street Address **823 Dorgene Lane, Cincinnati, OH 45244** City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. _(If more than two, list under PARTICULARS below.)_

| Name **First Data Corporation** | No. Employees, Members 20,000 + | Phone No. (Include Area Code) (866) 382-8643 |
|---|---|---|

Street Address **5565 Glenridge Connector #2000, Atlanta, GA 30342** City, State and ZIP Code

Ohio Civil Rights Commission

| Name **First Data Corporation** | No. Employees, Members 20,000+ | Phone No. (Include Area Code) |
|---|---|---|

Street Address **11311 Cornell Park Drive, Cincinnati, OH 45242** City, State and ZIP Code

**JUL 18 2018**

DISCRIMINATION BASED ON (Check appropriate box(es).)

__ RACE __ COLOR _X_ SEX __ RELIGION __ NATIONAL ORIGIN

_X_ RETALIATION __ AGE _X_ DISABILITY __ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest ~~Received~~ Latest

_X_ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attached extra sheet(s)):

This serves as an Amended Charge of Discrimination. A Charge of Discrimination was filed in the above referenced Charge Number with the OCRC on May 16, 2018 ("Original Charge"). The Dates of Discrimination have been amended from November 30, 2017 to a Continuing Action. Since the filing of the Original Charge, additional events of retaliation have occurred. Charging Party brought these subsequent retaliatory actions to the OCRC's attention by letters and e-mails on the following dates: May 25, 2018, May 29, 2018, July 10, 2018, and July 11, 2018 – those communications, along with the original Charge of Discrimination, are incorporated herein by this reference. The above described correspondence documented continuing harassment and retaliation against Charging Party for raising the sex and disability discrimination claims set forth in the Original Charge. Charging Party seeks that the OCRC include in its investigation all claims of retaliation, including those raised in the communications contained in the correspondence outlined above. Any right-to-sue letter issued in connection with this investigation should include the allegations of continuing retaliation set forth in this amendment.

To the extent the OCRC will not consider this to be an amended Charger of Discrimination, the Charging Party files this Charge as a new Charge of Discrimination related to the events described in the correspondence set forth above that have occurred during the period between May 2018 and July 2018, and are continuing, and seeks a separate investigation into this continuing retaliation.

Contact regarding this Amended Charge of Discrimination/Charge of Discrimination should be directed to counsel for the Charging Party – Shawn Shearer, The Law Office of Shawn Shearer, P.C., 3839 McKinney Ave. #155-254, Dallas, TX 75204, (972) 803-4499, shawn@shearerlaw.pro

**KRYSTLE IRETON**
Notary Public, State of Ohio
My Commission Expires
February 8, 2023

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY Required |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLANANT |
| 7/18/18 Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

Ohio Civil Rights Commission
Cincinnati Satellite Office

JUL 1 8 2018

Received

# EXHIBIT C

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254
DALLAS, TEXAS 75204
OFFICE: (972) 803-4499
SHAWN@SHEARERLAW.PRO

August 8, 2018

<u>**VIA E-MAIL & USPS**</u>

Veronica Y. Bedinger
Civil Rights Investigator
Ohio Civil Rights Commission
Cincinnati Satellite Office
Mid-Pointe Towers
7162 Reading Road, Suite 1005
Cincinnati, OH 45237

      RE:    Julie Kelly v. First Data Corporation
                 DAYB6(27240)05172016

Dear Investigator Bedinger:

    This firm represents Julie Kelly ("Ms. Kelly" or "Charging Party") in connection with the above referenced charge of discrimination. By letter to the EEOC dated May 16, 2018, Ms. Kelly alleges First Data Corporation ("First Data") violated the ADA, the PDA and Title VII, with respect to discrimination based on sex, and the corresponding provisions of Ohio law, in the course of Ms. Kelly's employment and termination (the "Charge Letter"). Since the filing of the Charge Letter, this firm, on behalf of Ms. Kelly, has also provided you additional communication by e-mail and letter, with exhibits, supporting the allegations in the Charge Letter, and the subsequent misconduct of First Data and its agents since that filing.

    By letter to you and the Ohio Civil Rights Commission ("OCRC"), Ms. Gillian Cooper, of the law firm Saul Ewing Arnstein & Lehr ("Saul Ewing"), delivered to you First Data's Position Statement (the "Position Statement") with respect to the allegations contained in the Charge Letter. The copy of the Position Statement the Charging Party received did not include exhibits to the Position Statement. In particular, the Charging Party has been unable to review the Declaration of Ms. Robin Ording that was attached to the Position Statement as, what appears from the Position Statement, to be important "evidence" being considered without the ability of the Charging Party to respond adequately to the contents of that sworn statement. Nevertheless, this letter constituted Ms. Kelly's reply to the contents of the Position Statement.

Veronica Y. Bedinger
August 8, 2018                                                                                     Page 2

## I.   OVERVIEW

The First Data's Position Statement is based solely upon the "factual" statements of Ms. Ording, and the unsubstantiated, and unsworn, statements of Saul Ewing. As is evident from Ms. Kelly's Charge Letter and the communications from this firm regarding the conduct of Saul Ewing in continuing to harass Ms. Kelly for bringing these claims, the only evidence and analysis from First Data is from the individuals (Ording and Gillian Cooper) and the firms (First Data and its agent Saul Ewing) directly implicated in the alleged wrongdoing. The position of First Data and its agents have not been reviewed by an independent party prior to its presentation to the OCRC. Saul Ewing is not in a position as outside counsel to adequately serve the function of filtering information appropriately to avoid misrepresentations of fact to the OCRC. Saul Ewing is implicated directly in the continuing retaliation against Ms. Kelly.

The attorneys at Saul Ewing are witnesses, not counsel. As such, their self-serving statements should be viewed in that light – unsworn and unsubstantiated statement of witnesses, not as counsel for First Data. Saul Ewing, on First Data's behalf, has taken actions against Ms. Kelly in furtherance of First Data's animus against her for raising the claims subject of the Charge Letter. If this case proceeds to litigation, Charging Party will seek the disqualification of Saul Ewing from representing First Data's interest.

The Position Statement completely mischaracterizes the statement of facts included in the Charge Letter. This is not the case of a woman seeking to avoid work. This is a case of a woman that continued her drive to work, provided excellent service to her employer for more than two decades, some of that service as part of reasonable accommodations granted by the company after interactive discussions with her managers. This case is about an inexperienced manager, Ms. Robin Ording, taking over a department she knew nothing about and with absolutely no experience in managing employees with disabilities.

This case is about the complete disregard of the right to work, with reasonable accommodations of an individual disabled from the complications of two difficult pregnancies. This case is about the atmosphere of First Data in which there is constant fear of termination for no reason, no tolerance for the disabled, and the resulting poor and illegal decisions that arise from that atmosphere by self-interested and obedient managers turning a blind-eye to their obligations under the law. From at least late 2016 until present, at First Data there has been no place for accommodating the needs of the disabled, especially accommodating the needs of a mother experiencing the medical effects of two pregnancies.

If Ms. Kelly, an employee that performed for 20-plus years in the only job she has had her adult life with an unblemished record, can be terminated based on the revocation of a reasonable accommodation, arising from complications from pregnancy, with absolutely no business justification, the ADA, Title VII and the Ohio law are meaningless of no protection to the citizens of Ohio.

**<u>Most importantly, no matter the validity of the underlying claim for discrimination against Ms. Kelly by Ms. Ording and First Data, the conduct of First Data and its agent,</u>**

**Saul Ewing, to retaliate against Ms. Kelly for simply raising and then bringing her claim is, in and of itself, evidence of the animus within First Data to the disabled and a separate violation of the law. (See Exhibit R-1 Amended/Supplemental Charge). First Data's and Saul Ewing's conduct since the time Ms. Kelly raised her charges is as, if not more, egregious that the original conduct of revoking a previously granted accommodation that was not causing any undue burden.**

## II.    DISQUALIFICATION/COMPLICITY OF SAUL EWING (FIRST DATA'S COUNSEL)

First Data's Position Statement was signed by Gillian Cooper of Saul Ewing. Saul Ewing and Ms. Cooper have been directly involved in the ongoing retaliation against Ms. Kelly. The OCRC should give no credibility to the self-serving testimony of First Data's witness (Robin Ording) and the self-serving analysis of First Data's counsel, Saul Ewing.

During May, June and July, 2018, the Charging Party provided numerous communications to the OCRC regarding the continuing harassment of Ms. Kelly by First Data and its counsel Saul Ewing by seeking her testimony as a third-party witness in the case of *Barger v. First Data*. In that case, Saul Ewing and Ms. Cooper have appeared as counsel defending First Data against Plaintiff Barger's allegations of First Data's violations of the Family and Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA).

In First Data's initial F.R.C.P. 26(a) disclosures in the *Barger* case, Saul Ewing and First Data disclosed Ms. Kelly as a potential witness and indicated that any contact with Ms. Kelly by Plaintiff Barger's counsel must be directed to Saul Ewing. Saul Ewing represented to Plaintiff Barger's counsel through such disclosure that Saul Ewing represented Ms. Kelly.

When Ms. Kelly raised her own issues of discrimination with First Data's in-house counsel, Saul Ewing and First Data set on a course of harassment and intimidation. When Ms. Kelly raised the possibility of bringing the complaints alleged in the Charge Letter, Saul Ewing threatened Ms. Kelly with calling her as a third-party deponent in the *Barger v. First Data* case. When Ms. Kelly did file the Charge Letter, Saul Ewing and First Data followed through with that threat and subpoenaed Ms. Kelly as a third-party deponent. Ms. Kelly rearranged her summer schedule to comply with the subpoena issued by First Data and Saul Ewing. Ms. Kelly appeared at the time and place specified for the deposition. Saul Ewing and First Data, however, did not appear at the time and place they had designated in the subpoena. SaTl Ewing and First Data NO-SHOWED a deposition that they noticed, while Ms. Kelly, a non-party under went expense and time to show for that deposition.

then, First Data and Saul Ewing, had the gall to file a motion to compel Ms. Kelly to give the deposition for which she showed and they had no-showed. Ms. Kelly responded to that motion *pro se*. Ms. Kelly believed Saul Ewing was her lawyer because of the F.R.C.P. 26(a) disclosures filed by Saul Ewing in the *Barger v. First Data* case.

In addition, Saul Ewing's conduct on July 3, 2018 was unethical and a disgrace to the legal profession under any possible ethical standard for the conduct of an attorney. It also constituted unlawful continuing harassment of Ms. Kelly for raising the discrimination claims that are subject of the Charge Letter. On July 3, 2018, Ms. Kelly believed Saul Ewing was her counsel in the *Barger* case because of the Rule 26(a) disclosures that had been filed. On July 3, 2018, Ms. Cooper, on behalf of Saul Ewing, contacted Ms. Kelly by, according to Ms. Cooper, a call to Ms. Kelly's personal cell phone number, to request new dates on which she could give her deposition in *Barger v. First Data*.

On July 3, 2018 (well after the Charge Letter was filed), Ms. Cooper of Saul Ewing attempted to cajole Ms. Kelly to agree to a new deposition date (somehow to replace the deposition that Saul Ewing no-showed) in *Barger v. First Data*, when Ms. Kelly believed Saul Ewing, Ms. Cooper, and her supervising partner, Gary Eidelman, were serving as her counsel in that case. At the same time Ms. Cooper was trying to improperly coax Ms. Kelly to testify (with Ms. Kelly believing she was her lawyer), Ms. Cooper was simultaneously finishing and filing the Position Statement against Ms. Kelly in this case that she filed with the OCRC on July 3, 2018.

Ms. Cooper and Saul Ewing have taken adverse positions (both in *Barger v. First Data* and in this case *Kelly v. First Data)* against an individual that believed that she was represented by Saul Ewing.  Ms. Cooper and Saul Ewing knew Ms. Kelly believed them to be her counsel in *Barger v. First Data*. The conduct of Ms. Cooper and Saul Ewing on July 3, 2018 is without any justification whatsoever, is sanctionable, and a violation of every ethical rule on the topic. See, e.g., Model Rules of Professional Conduct 1.7.

The conduct and statements of of Saul Ewing and Ms. Cooper, acting under the supervision and direction of Gary Eidelman, in defending First Data in the Position Statement, is a completely self-serving excuse and diversion from the violation of their ethical responsibilities to Ms. Kelly, and their retaliatory conduct on behalf of First Data against Ms. Kelly for raising the charges that are subject of the OCRC's ongoing investigation in this case.

The entire Position Statement signed by Ms. Cooper and Saul Ewing must be read in light of Ms. Cooper's and Saul Ewing's complicity and direct action to continue the discriminatory retaliation against First Data.

At no time prior to July 3, 2018 did Ms. Cooper of Saul Ewing ever indicate that Saul Ewing was representing First Data adverse to Ms. Kelly in this case. Yet, the entire time, knowing Ms. Kelly believed them to be her attorneys in *Barger* based on First Data's F.R.C.P. 26(a) disclosures signed by Saul Ewing.

An attorney's deception of a "client" to advance the interest of another client is beyond any possible standard of professional conduct.  On July 3, 2018, Ms. Cooper and Saul Ewing knew Ms. Kelly believed Saul Ewing was her counsel in the *Barger v. First Data* case. On July 3, 2018, Saul Ewing contact Ms. Kelly to ask when she could testify in the *Barger v. First Data* case. At almost exactly the same time as that contact, on July 3, 2018, Ms. Cooper signed and filed the

Veronica Y. Bedinger
August 8, 2018

Position Statement in this case on behalf of First Data adverse to Ms. Kelly without ever disclosing their adverse interest to Ms. Kelly.

Ms. Kelly did not know that Saul Ewing had chosen to represent First Data in connection with her complaints in the Charge Letter until a copy of the Position Statement was presented to her in July, in person by you and your staff, while MS. Kelly and her husband were at the OCRC's office in Cincinnati. Up until that point, Ms. Kelly did not believe that Saul Ewing was adverse to her interests and, in fact, thought Saul Ewing would be representing her in the *Barger v. First Data* case based on the F.R.C.P. 26(a) disclosures.

It was not until after Ms. Kelly received a copy of the Position Statement that she realized that Saul Ewing and Ms. Cooper, who had been contacting her for months, were acting not as her counsel, but as counsel adverse to her interests in her complaint in the Charge Letter.

Saul Ewing is culpable for the injuries to Ms. Kelly and should not be permitted to serve as her counsel in this investigation or in any subsequent litigation arising out of the facts set forth in the Charge Letter.

## III.   SEPARATE CAUSE OF ACTION - RETALIATION BY FIRST DATA AND SAUL EWING POST NOTICE OF ALLEGATIONS AND CHARGE

A complete history over the period from when my firm raised Ms. Kelly's concerns about violations of her statutory rights as outlined in the Charge Letter and through today is attached as Exhibit A through Exhibit V.  **It is evidence of the severity of the claims that it takes more than 20 exhibits to chronicle the history of the backlash against Ms. Kelly for her raising her claims subject of the Charger Letter.** This timeline of events spans from Ms. Kelly first raising her potential claims to in-house counsel at First Data on April 27, 2018 through her *pro* se response to First Data's and Saul Ewing's motion to compel Ms. Kelly to testify in a case in which Ms. Kelly believed Saul Ewing was serving as her counsel.

The actions of First Data and their counsel Saul Ewing clearly demonstrate retaliation against Ms. Kelly for raising her claims of discrimination to First Data's in-house legal department and then filing her claims.  This retaliation following Ms. Kelly's discharge from employment, based solely on claims arising from during her employment, is actionable as retaliation in violation of the ADA, PDA, Title VII, and Ohio law. No matter the underlying validity of Ms. Kelly's original claims (which are discussed in detail below), the retaliatory actions by First Data, and the unethical means by which they were implemented by First Data's agent Saul Ewing, and, in particular, Ms. Cooper and Mr. Eidelman, creates a completely separate cause of action. Individuals exercising their rights to petition the EEOC and OCRC with grievances as to their treatment by their employer, even if no longer employed by that employer, may not be harassed and subjected to humiliation, cost and inconvenience in wholly unrelated matters in retaliation for raising these claims.

The retaliation by First Data and Saul Ewing against Ms. Kelly is obvious from these few dates.

THE LAW OFFICE OF SHAWN SHEARER, P.C.

| | |
|---|---|
| **April 27, 2018** | **Initial letter sent to First Data raising discrimination claims (Ex. A)** |
| May 01, 2018 | First Data's Response to Initial Claims (Ex. B) |
| May 03, 2018 | Second letter to First Data re: discrimination claims (Ex. C) |
| **May 10, 2018** | **First Data notices intent to issue subpoena to Ms. Kelly (Ex C-1)** |
| **May 16, 2018** | **Ms. Kelly's Charge Letter filed with EEOC and OCRC (Ex D-1)** |
| May 17, 2018 | Courtesy copy of Charge Letter provided to First Data (Ex D-2) |
| **May 23, 2018** | **Subpoena Served on Julie Kelly (Ex E)** |

In just less than two weeks (April 27 to May 10), First Data's in-house legal department received the first notice of Ms. Kelly's complaints surrounding her termination of employment and then First Data issued a notice of intent to issue Ms. Kelly a subpoena to give a deposition in a case in which she was not a party and has no relevant information. A case that has been in discovery for more than three months and a deposition of Ms. Kelly never discussed. A case in which even the Plaintiff had not yet been deposed. The May 10th threat to issue a third-party subpoena to Ms. Kelly was in direct response and retaliation to her raising claims of discrimination with First Data's in-house legal department on April 27th.

The retaliation escalated further after Ms. Kelly followed-through and filed her Charge Letter (May 16 to May 23). No longer was the third-party subpoena merely a threat by First Data and Saul Ewing, but in retaliation for bringing the claims set forth in the Charge Letter, First Data and Saul Ewing followed through by subpoenaing Ms. Kelly in a case in which she has no interest and has no relevant information. The animus for raising discrimination claims is obvious.

Ms. Kelly raised her issues of discrimination with First Data on April 27th and May 3rd. On May 10th First Data's counsel advised Plaintiff Barger's firm that it intended to subpoena Ms. Kelly in the *Barger v. First Data* case. On May 16th Ms. Kelly filed her Charge Letter and on May 17th provided First Data a courtesy copy of the filing. Then, on May 23rd, First Data served (through surreptitious means – See Ex. E) Ms. Kelly a subpoena to testify in a case to which she is not a party and has no relevant information.

Since the *Barger v. First Data* case was filed in August 2017, First Data has not subpoenad any other employee or former employee under Mr. Barger's management while at First Data. The ONLY former employee managed by Mr. Barger to be subpoenaed in his case was the Charging Party. The only former employee of Mr. Barger against whom a motion to compel testimony has been filed is Ms. Kelly. The only former employee of Mr. Barger hauled into federal court by First Data and Saul Ewing to testify is Ms. Kelly. The only former employee of Mr. Barger that has been forced to change her summer schedule to attend a deposition that did not occur is Ms. Kelly. The only former employee of Mr. Barger that has been publicly accused (wrongly) of failing to abide by a subpoena is Ms. Kelly. Such public accusations harm Ms. Kelly's job search by wasting her time, and harm her reputation while seeking employment (a mere search of litigation involving Ms. Kelly now brings a wrongful motion to compel immediately to a background report). The retaliatory actions of Saul Ewing on behalf of First

Data constitute adverse employment actions against Ms. Kelly for raising the charges that are the subject of the Charge Letter.

The temporal proximity of these events shows nothing other than First Data's, and their agent Saul Ewing's, intentional and deliberate retaliation against Ms. Kelly for even raising the claims (despite their actual validity). See *Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516 (6th Cir. 2008)

In reviewing Exhibits A through V, keep in mind that at the time Ms. Kelly was subpoenaed in the *Barger v. First Data* case, Plaintiff Barger had not even been noticed to testify. In fact, First Data had only subpoenaed Mr. Barger's physicians. Ms. Kelly has no information relevant to Mr. Barger's claims. Mr. Barger was Ms. Kelly's supervisor. Ms. Kelly did not control his employment. Ms. Kelly does not know the conditions or facts surrounding his termination.

This exhaustive listing of events to harass Ms. Kelly over just three months is indicative of the hostile environment at First Data to those that raise issues of discrimination. If you raise issues, First Data's outside counsel will attack you in any way possible. The cost, expense and emotional toll Ms. Kelly for merely raising her claims has been significant. Ms. Kelly received a subpoena and went through the cost and hassle, not because she had any information to offer at a deposition, but solely because she dared raise the issues set forth in the Charge Letter.

**Whether or not the underlying claims made by Ms. Kelly in the Charge Letter have validity (this firm is insistent that they do), the conduct of First Data and Saul Ewing, including Ms. Cooper, are new and wholly separate acts of retaliation that are actionable in and of themselves.** An amended/supplemental charge of discrimination to address these actions was filed on July 18, 2018 incorporating Ms. Kelly's retaliation claims discussed in Sections II and III above.

Saul Ewing is liable for continuing retaliation against Ms. Kelly, the damage to her reputation by the filing of an unjustified motion to compel (Ms. Kelly complied with the subpoena and appeared at the designated time and place and it was Saul Ewing that no showed the court's order they themselves issued), inhibiting Ms. Kelly's mitigation the damages by consuming her time over months dealing with a subpoena, and inhibiting Ms. Kelly's mitigation of damages by publicly accusing her of failing to comply with an issued subpoena when it was Saul Ewing that did not comply with the subpoena. *Aria v. Raimondo*, 860 F.3d 1185 (9th Cir. 2017).

## IV.    VIOLATION OF THE ADA, PDA, TITLE VII AND OH. STAT SEC. 4112.01 *et seq.*

Disability and Pregnancy

As outlined in the Charge Letter, Ms. Kelly is 40 years old and worked her entire adult life for First Data. Over more than 20-years of service, Ms. Kelly's reviews and performance are outstanding without any blemishes.

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Veronica Y. Bedinger
August 8, 2018

The Charge Letter and documentation provided to the OCRC outline Ms. Kelly's medical issues and disabilities arising out of two difficult pregnancies. This firm has reviewed the Ms. Kelly's medical records.

Briefly, the timeline is below.

| | |
|---|---|
| October 2011 | Ms. Kelly undergoes surgery for the removal of uterine myoma. |
| December 2012 | Ms. Kelly gave birth, after a difficult pregnancy, to twins. |
| March 2013 | Ms. Kelly returns to her First Data position, working remotely with no changes to position or responsibilities. |
| October 2014 | Ms. Kelly was pregnant with her son born prematurely in February 2015. Because of her high-risk pregnancy, Ms. Kelly completed First Data's Work Place Adjustment Form based on her physician's recommendation for no travel due to a history of myomectomy and prior C-section. This request was approved by First Data. The "estimated date of confinement" specified by her OBGYN was March 5, 2015. |
| December 2014 | Ms. Kelly received emergency care for premature labor, cramping and pregnancy complications. Ms. Kelly continued to work full-time remotely. |
| January 2015 | First Data revises its work-from-home policy. Ms. Kelly continues working from home with her manager's approval based on the accommodation granted in October 2014. |
| February 2015 | Ms. Kelly's son was delivered by c-section at only 38-weeks of gestation. The infant was placed in neonatal care and was born with vascular malformation requiring immediate attention and years of appointments at Cincinnati Children's Hospital Hemangioma and Vascular Malformation Center. |
| March/April 2015 | Ms. Kelly is treated for severe, almost deadly, infection of her c-section incision. Ms Kelly suffered severe post-partum depression, recti-diastasis and umbilical hernia. |
| April 23, 2015 | Ms. Kelly returned to work after 8-weeks from the birth of her son as consistent with First Data's policies for births by c-section. The change in First Data work-from-home policy had been implemented during her absence. |

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Veronica Y. Bedinger
August 8, 2018

| | |
|---|---|
| May 12, 2015 | Ms. Kelly contacts her manager, Steve Barger, to resign due to her health conditions arising from her pregnancies. Mr. Barger engages in an interactive with Ms. Kelly and based on those discussions, Mr. Barger and Ms. Kelly agreed that Ms. Kelly could continue to work remotely despite the implementation of the new policy. Mr. Barger granted Ms. Kelly a reasonable accommodation for her disabilities arising out of her two difficult pregnancies. See Barger's declaration attached as Exhibit Z. |
| April – July 2016 | Ms. Kelly is hospitalized for health issues, including non-alcoholic fatty liver disease, high blood pressure, stress disorder and anxiety from the continuation of pregnancy complications. Ms. Kelly continued to remotely fulfill her job functions and received excellent reviews from her manager. |
| November 19, 2016 | Mr. Barger begins FMLA leave to recover from cancer surgery. Ms. Robin Ording is appointed as interim leader of Mr. Barger's sales transformation and sales training team and becomes Ms. Kelly's manager |
| Nov/Dec 2016 | Ms. Kelly's work-from-home accommodation is revoked by Ms. Ording. Ms. Kelly suffered additional stress and anxiety related to the burdens of losing her reasonable accommodation, but she continued to perform her job functions without blemish and with outstanding reviews. Ms. Kelly also was diagnosed with thyroid medical issues during this period. |
| May 2017 | Thyroid issues continued. Ms. Kelly underwent MRI's, Xrays, thyroid lab tests. She sought treatment for continuing stress and anxiety disorders and continuing physical and mental effects of her pregnancies. Ms. Kelly complied with Ms. Ording's and First Data's revocation of her accomodation and implementation of a policy requiring to work from the office. Ms. Kelly's health conditions worsened. |
| Sept/Oct 2017 | Ms. Kelly, while in the office and suffering from anxiety and stress, suffered a cardiac episode (chest pain, dizziness, and low lung volume arising from stress, anxiety and continuing complications from pregnancy) while in First Data's Cincinnati office and is driven from the office to the emergency room on September 29, 2017. Follow-up appointments and monitoring of cardiac issues during October 2017.  Ms. Ording was aware of Ms. Kelly's medical condition.  Ms. Kelly continued to perform the functions of her job, even receiving outstanding reviews for her work. |

Veronica Y. Bedinger
August 8, 2018                                                                                         Page 10

November 2017          Ms. Kelly requests that Ms. Ording grant a reasonable
                       accommodation for health reasons or she would resign. Ms. Ording
                       accepts the resignation and does not engage in an interactive
                       process to address Ms. Kelly's disabilities and health conditions in
                       a manner previously addressed by her prior managers.

Revocation of Accommodation

        During this entire period, October 2014 through November 2017, Ms. Kelly was disabled
for purposes of the ADA and Ohio law. Ms. Kelly continued to perform the essential functions of
her job with an accommodation exempting her from the no work-from-home policy that served
no purpose in her situation where none of the First Data employees she interacted with were not
in the Cincinnati office and she always communicated remotely, whether from home or in the
Cincinnati office.  Ms. Ording, her supervisor, has testified that she manages employees across
the globe remotely without issue.

        Ms. Kelly's accommodation was not an undue burden on First Data. Ms. Kelly had been
performing her functions remotely for a decade with no performance issues.

        When Ms. Ording revoked Ms. Kelly's accommodation disability conditions worsened.

Failure to Engage in Interactive Process

        The clearest evidence of First Data's and Ms. Ording's animus against the disabled can
be seen in this very simple example.

        After Ms. Kelly's son was born in February 2015, and she returned to work, First Data
began enforcing its policy against working from home, even if work in the office was not an
essential function of the job.  In response to this policy's impact on her health, Ms. Kelly wrote
to her then supervisor, Mr. Steve Barger, by e-mail on May 12, 2015 (Ex. X):

        Steve,

        After 17 years of successfully achieving projects, goals and requirements
        working from a home office, the time and costs that it would take to
        commute into the Blue Ash corporate office (Cincinnati, OH) are
        prohibitive to my success both professionally and personally. I have been
        fortunate to have 'grown-up' with First Data and have greatly appreciated
        the positive work life balance the company once promoted. While
        inevitable, receiving this news so shortly after returning from maternity
        leave has been quite disheartening.

        My position does not require daily interaction with others face to face and
        will not change once in the Cincinnati, OH location. Moving toward a

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Veronica Y. Bedinger
August 8, 2018

more virtual learning environment is a must for a company of this size and
will only continue to be a priority. This has been a leadership quality I
have excelled at bringing to the company working from a remote office.

In response to this e-mail, Mr. Barger, a veteran manager nearly 70 years old,
instinctively knew that the loss of Ms. Kelly's talent was a loss to First Data and to his team.
Mr. Barger responded to Ms. Kelly's notice of resignation by engaging her in an interactive
process to discuss her disabilities arising from her two difficult pregnancies. Because of these
conversations and interaction, Mr. Barger made the managerial decision to allow Ms. Kelly to
continue to work in the same manner in which she had been working for years as a reasonable
accommodation and Ms. Kelly did not resign and continued to provide her recognized skills and
performance to First Data. Mr. Barger did exactly what a manager should do when receiving an
e-mail such as that he received from Ms. Kelly in May 2015. He engaged in an interactive
process to discuss her concerns and made appropriate and reasonable accommodations to address
his employee's disabilities.

Ms. Ording's conduct just over two years later stands in stark contract to the actions of
Mr. Barger. When receiving a nearly identical e-mail, but with even more indication of disability
issues, Ms. Ording responded 180 degrees opposite of the manner in which Mr. Barger
responded.

In late 2016, Ms. Ording revoked Ms. Kelly's reasonable accommodation provided by
her prior two managers and was requiring office attendance (including electronically monitoring
of badge-ins). Then, on November 14, 2017, by e-mail, Ms. Kelly expressed the very same
issues to Ms. Ording that she had expressed to Mr. Barger. In fact, her request of Ms. Ording was
even more direct than that received by Mr. Barger two years earlier. Ms. Kelly directly indicated
to Ms. Ording that the stress and her health were at issue and the choice was resign for the sake
of avoiding the stress that she was under physician's care to treat and the impact on her health.
On November 14, 2017, Ms. Kelly informed Ms. Ording the following (Ex. Y)(compare to the
May 2015 e-mail to Mr. Barger Ex. X – the two are nearly identical, other than the inclusion of a
blatant appeal to health and stress issues included in the e-mail to Ms. Ording):

Robin,

After nearly 20 years of successfully achieving goals, projects and leading
stellar teams for First Data, the change in policies, such as the requirement
to work in an office location, have proven prohibitive to my success both
professionally and personality. I have been fortunate to have 'grown-up'
with First Data and have greatly appreciated the experiences and positive
work life balance the company once promoted.

During the past two years, I have done a highly successful job of
balancing the demands of First Data with the ever-changing deadlines,
priorities, teams and projects. With that said, I have also lost many
precious hours that could have been dedicated to what means the most, <u>my</u>

THE LAW OFFICE OF SHAWN SHEARER, P.C.

> health and family. Lost time in the countless hours of commuting to a
> building where a handful of people report in to. After working
> successfully from home for nearly 10 years, the change First Data made
> has contributed to my numerous health issues with increased stress,
> financial constraints and extraordinary burdens on my family.

Unlike Mr. Barger, Ms. Ording, when faced with an obviously direct request for an
accommodation, chose a completely different route than Mr. Barger. Rather than engage in an
interactive process with Ms. Kelly as Mr. Barger did, Ms. Ording gladly accepted Ms. Kelly's
resignations and laughed, literally laughed, at Ms. Kelly's request for severance. Ms. Ording has
no tolerance for disabilities or health issues within her organization.

It seems inconceivable, but it is a fact, that Ms. Ording, a 30-year plus human resources
professional, is numb and oblivious to the requirements of the ADA, PDA, Title VII, and OH
Rev. Code 4112.01 *et seq* as it applies to disabilities arising out of pregnancy complications.

Ms. Ording has testified under oath that over her entire 30-year HR career, not a single
employee of hers has requested a reasonable accommodation for a disability and,
correspondingly, she has testified that she has never granted an employee's reasonable
accommodation request. It is unfathomable that over 30-years managing employees at huge
institutions like Citi, Chase, and First Data, Ms. Ording never had an employee request an
accommodation. A perfect example of such a request is Ms. Kelly's November 14, 2017. Ms.
Ording clearly does not know what a reasonable accomodation looks or sounds like, and Ms.
Ording has no sensitive to an issue that should top of mind of any human resources professional.
Ms. Ording is, frankly, incompetent, to be a manager in the field of human resources.

The obvious explanation of Ms. Ording's testimony that she has never received an
accommodation request is that (i) Ms. Ording does not comprehend the concept of
accommodating disabled employees in a manner that is reasonable and that is not an undue
hardship on the employer, and (ii) the atmosphere at First Data is such that Ms. Ording's blind
adherence to the enforcement of the no-work from home policy outweighs the legal requirement
to accommodate disabled employees. Ms. Kelly had discussed her conditions, at a high level,
with Ms. Ording. As a 30-year career professional, Ms. Ording should have heard these
discussions as a cue to begin an interactive process to discuss accommodations. Ms. Ording was
tone deaf to the signals. Then, when Ms. Ording received Ms. Kell's "resignation" e-mail, as a
career HR professional, she should have seen the obvious request for an accommodation. Ms.
Ording again was tone deaf and instead of seeking accommodations, laughed at Ms. Kelly and
accepted the accommodation.

Mr. Barger was sensitive enough to realize that Ms. Kelly's attempted resignation in
2015 was a request for an accommodation (even though that request hardly mentioned health
issues). Mr. Barger properly discussed the issue with Ms. Kelly and made an exception to the no
work from home rule as an accommodation. From that time forward, Ms. Kelly received
outstanding reviews of her work and commitment to First Data, including outstanding reviews

Veronica Y. Bedinger
August 8, 2018                                                                                    Page 13

from Ms. Kelly and financial rewards from First Data's EVP of HR. Ms. Kelly's performance over a 10-year period under prior supervisors was unblemished.

Ms. Ording, on the other hand, upon taking Mr. Barger's supervisory position, revoked the accommodations Ms. Kelly's prior managers had granted. Ms. Ording, when faced with a request for an accommodation (nearly identical, but more direct on health and stress issues, to that received by Mr. Barger), did not engage in an interactive process and merely accepted the resignation, laughed at Ms. Kell's request for severance, and now has the gall to file a sworn statement in the Position Statement trying to justify her decision.

Ms. Ording's actions were a violation of the ADA, PDA, Title VII, and OH Rev. Code Sec. 4112.01 *et seq*. There is no excuse. When faced with a request for an accommodation like Ms. Kelly's on November 14, 2017, Ms. Ording intentionally chose to ignore the law (she is a 30-year HR professional trained and aware of the law and has decades of experience).

Ms. Ording was more interested in keeping her bosses happy through cost controls and terminations within her group than she was listening to an employee's request for an accommodation. Ms. Ording knew better and is trained in HR. Ms. Ording bragged about her cost cutting and created an atmosphere of fear for job loss to control her employees. Ms. Kelly attempted to subtly raise her disability issues in this hostile atmosphere. Ms. Kelly strongly requests that the OCRC continue its investigation into the conduct of First Data and Saul Ewing. Ms. Ording's self-serving claims serve only to demonstrate her lack of observation and lack of listening to the employees she manages.

Very truly yours,

Shawn E. Shearer

cc:      Julie Kelly

THE LAW OFFICE OF SHAWN SHEARER, P.C.

# EXHIBIT D

Kelly, Julie K ▆▆▆▆▆▆                                    Encounter Date: 08/31/2018

# Kelly, Julie K                                        ▆▆▆▆▆▆

**Telephone** 8/31/2018          Provider: ▆▆▆▆▆▆
Status: Open                     Reason for call: Medications Refill
▆▆▆▆▆ Hospital Physicians -

## Conversation: Medications Refill                    (Newest Message First)

▆▆▆▆▆▆ routed this conversation to ▆▆▆▆▆ ⬆    8/31/18 1:54 PM 

▆▆▆▆▆▆ routed this conversation to ▆▆▆▆ ⬆      8/31/18 1:52 PM

▆▆▆▆▆
◤ Note                                                  8/31/18 1:50 PM

Pt is in the waiting room waiting on this medication. Pt wants to have this refilled ASAP. Pt is using Walgreen's on Lila Ave.

▆▆▆▆▆ CMA routed this conversation to ▆▆▆▆▆      8/31/18 1:22 PM
PA

↩ Julie K. Kelly contacted ▆▆▆▆▆ CMA               8/31/18 1:18 PM

▆▆▆▆▆ CMA
◤ Note                                                  8/31/18 1:18 PM

Pt states she is involved in a few court cases, pt states she is having a hard time dealing & doing things, her anxiety is very high, pt is aking for a refill of Lexapro.

*This encounter is not signed. The conversation may still be ongoing.*

## Additional Documentation

Encounter Info:   Billing Info, History, Allergies, Detailed Report

## 🗎 Pended Orders

Kelly, Julie K (MR # 10258813)

Encounter Date: 08/31/2018



None

## Routing History

| Priority | Sent On | From | To | Message Type |
|---|---|---|---|---|
| ⬆ | 8/31/2018 1:54 PM | ▓▓▓▓ | ▓▓▓▓ PA | Patient Calls |
| ⬆ | 8/31/2018 1:52 PM | ▓▓▓▓ | ▓▓▓▓ | Patient Calls |
| | 8/31/2018 1:22 PM | ▓▓▓ CMA | ▓▓▓ PA | Patient Calls |

## Created by

▓▓▓▓▓ CMA on 08/31/2018 01:18 PM

## Orders Placed

None

## Medication Renewals and Changes

As of 8/31/2018  1:20 PM

None

## Visit Diagnoses

None